Good morning. I'm Kathy George, here for the appellants, and I will be speaking to the NEPA issues. My co-counsel, Mr. Lobsons, will be speaking to the First Amendment issues this morning. And how are you dividing your time? I will take nine minutes, he will take six, and we will reserve six minutes for rebuttal. I will tell you when the nine minutes are up, and then you can do what you want. Thank you. I want to start by explaining six lies in the environmental impact statement for the explosives handling wharf that rendered the statement deficient under the National Environmental Policy Act. The first lie, the most important one, was the statement that the site of this wharf was the, quote, only available location along the Bangor waterfront that ensures required separation distances are maintained. So this is telling the public we're ensuring that there is a minimum safe distance between explosives handling facilities when internally the Navy was discussing the very opposite, that the Explosives Safety Board had rejected the site as being dangerously close to the existing operation. Number two, the environmental impact said that this project would not conflict with any federal requirements, and we know now from the record that is not the case. This project actually violates the Department of Defense's own explosive safety siting regulations. Ms. George, why isn't the 2004 case here? I know you're going to go through all your issues, but I'm just trying to figure out why the 2004 Ground Zero versus U.S. Navy doesn't control here. It does not control because that case concerned the risks of a single missile mishap. Those 1990 studies that the court and the Navy relied on in that case had to do with what happens when one missile is involved in an accident. This is an entirely different situation. This is the first time that the Navy has planned to handle missiles at two adjacent facilities at the same time, and the regulatory body that is responsible for protecting public safety in these situations said, you don't have the data. You don't have the scientific data to show that this is safe, so it's completely different. In the other case, the court was satisfied that there had been a study of the risk. This is a different risk, and it's never been studied, and the record shows that the Explosives Safety Board raised that concern. Going back to my list of lies, and this is related, the public was told that no consultations or permits are required for safety, and we know that's not the case. Of course, the Department of Defense Explosives Safety Board did have regulatory authority and was supposed to be publicly consulted, and its comments underneath that were required to be part of the publicly distributed environmental impact statement. That didn't happen. The public was told basically this review didn't even need to occur. This is an unusual situation in which the whole documentation of the Department of Defense explosive discussion regulations and so on was in the administrative record but not in the record that was available to the public at the time. How did that happen? How does that come about? That's exactly right, Your Honor. It's not a right or wrong explanation. What happened here? There was quite a bit of public participation in the EIS process, and one of the most common concerns expressed in that process was the lack of safety analysis. The Navy knew internally during the public process that it was not getting safety approval, yet made the internal decision to hide that fact from the public and to rely on what it calls a secretarial certification to simply assume the risks of violating. It shows up in the administrative record. That's what I'm trying to understand. There was no requirement for the Navy. There was no order. There was no compelled production in this case. The Navy voluntarily chose to put thousands and thousands of documents into the administrative record. Why there was such a dramatic disparity between what was disclosed during the EIS process and what has been disclosed since then is really a question that the Navy has to answer, but certainly those post-EIS disclosures don't cure the problem under NEPA. NEPA is designed to accomplish two goals. One, to make sure that the decision-makers have all the relevant information, but two, to make sure that the public sees the analysis and has the scientific basis for the conclusions reached by the agency, and that latter purpose of disclosure was certainly not met in this case. Let me ask you a question. If the Navy was not required under NEPA to analyze the risk of explosions hazards at Bangor, why should it have been required to disclose that the board withheld approval of the new wharf? The NEPA regulations require that when a possible catastrophic impact is possible, even if it is improbable as in this case, the EIS still has to disclose that there is missing and incomplete information and has to say what it does know and has to explain why it can't obtain the relevant information, and this was exactly that kind of scenario where... The nature of the risk may be influenced by how catastrophic it is, but nonetheless there was some conclusion here that the risk was insignificant, but the dispute with the Explosives Board was precisely on that question, isn't there? So therefore it seems to me to be circular. I mean, what's the dispute on that issue? Wasn't what the board was saying is you haven't proved up this 10 to the minus 6? Well, Your Honor, I don't think there was a dispute with the Explosives Safety Board. The dispute was the adequacy of the proof. In other words, the Explosives Board was saying you haven't demonstrated the degree of the risk is what you say it is. That's right, and the Navy... When I say there wasn't a dispute, the Navy admits in the record that they don't have the data to show that an explosion at one wharf would not cause a propagation to missiles in the other wharf. The Navy doesn't dispute that. That's in the record. They have never analyzed that. So in that sense, there's not a dispute with the Explosives Safety Board. The only dispute was whether they should be able to go ahead with the project. And as we know, in this case, they resorted to just assuming the risk of violating the safety standards. What was that information? You still have your nine minutes, but you can keep going if you want. Well, very quickly, I want to address the other lies. Let me ask you, because you've never challenged the Navy's determination that the wharf one alone is insufficient to meet the operational needs as arbitrary and capricious. Can you identify any other alternative action to building the second wharf that would allow the Navy at least the 400 operational days to serve the Trident Program? Because I didn't see... I know you're challenging that they didn't do enough to look for alternatives, but I didn't see where you offered any alternatives. Well, the relief request, if I'm understanding your question correctly, the relief request at this point is another study that addresses at a minimum the risk of propagation, and that includes publicly consulting with the Explosive Safety Board. And Your Honor mentioned the arbitrary and capricious standard. The standard actually applicable in this case, it's to no more review. And the question is whether the Navy complied with NEPA procedures. So it's not the deferential standard of arbitrary and capricious. However, that standard also is met here because the conclusions in the EIS run counter to the evidence that was before the agency. And when that is the case, to be blunt, when lies are told, the courts have said, this court has said, that is arbitrary and capricious. And as for the... If you were asking about what is the alternative to building the wharf in this location, well, one alternative that has never been discussed is what about restoring the fragmentation barrier? The fragmentation barrier was originally required as part of the siting of this project. It's supposed to protect this very... It's supposed to protect the public from this very problem of propagation from one wharf to the other, and it's been removed. And the environmental impact statement doesn't address that at all. Can I ask you what the current status of this project is? There was a story in the Kitsap Sun a month ago that said it's 90% complete. But, of course, that does not mean that there is no effective remedy available. As this court has held in numerous cases, the completion of a project does not moot a NEPA case. If it did, then agencies could just ignore the requirements of the law by waiting until... by ignoring the requirements while the case winds its way through the courts. But if it is 90% complete, what would be the remedy? The remedy would be to require a supplemental study that examines these risks that have never been examined, studying the actual... the risk that an explosion at one wharf will cause an explosion at the other, which has never been studied. Where the kinds of...this concern is about the use of the project, not the building of it. I mean, the easy answer is ultimately they could just abandon it, theoretically. They could just say, we're not going to use it. Well, that's right. Because it's not about affecting wildlife by building the thing. It's about the use of it. That's right. And this court could enjoin the Navy from operating both wharves at the same time until the requisite... Until the studies were done, or until... That's not how... It seems like it was the pile driving, those kind of things that were typically, you know, the concern seemed to... The concerns that were raised seemed to be related a lot to the construction as much as anything else. Well, there were more than 2,000 pages in the EIS. And Your Honor is correct that the vast majority of the discussion in the EIS was about the sort of traditional environmental concerns, the impact on wildlife and so forth. There were six pages devoted to safety. But we're talking about a project that could cause a fireball across Hood Canal. So safety should have been a much bigger part of that EIS. And I'm going to ask my colleague to speak now. Good morning, Your Honors. I'm Jim Lobsons, and I also represent the appellants. The issue I'm going to address is the order that the district court entered on November 9th of 2012. Please speak up. I'm having trouble. Sorry. I'm going to address the issue involving the order Judge Layton entered on November 9th, 2012, in which after being approached ex parte, he forbade my clients from making any reference or using in any way, even in the litigation, a number of documents which the Navy put in the public record without any compulsion at all, a number of documents which is actually available on the Internet yesterday when I last checked, a number of documents which Mr. Milner has been able to routinely find for the last six years, and yet because of this order for the last three and a half years, my clients are the only people in the world who cannot mention these documents or use them or distribute them, and we have obeyed that order for the last three and a half years. The main legal issue before you really is to analyze whether or not this case is like Cox Broadcasting and governed by those cases, Cox Broadcasting and Florida Star, or whether, as the Navy would have you believe, it is like the Reinhardt v. Seattle Times case. There are six reasons why it is nothing like the Reinhardt case and why it is governed by Cox Broadcasting. First of all, there was no compulsion. Counsel, I have a question for you about interpreting the order. If we were to interpret the order not to prohibit the dissemination of a document that has been located in an independent source, would that solve your problem? In other words, the ones that are on the Internet that you found in the Seattle Times that you located in the Wall Street Journal, whatever, that order simply doesn't cover that. Why wouldn't that suffice? That would suffice for some of the documents, Your Honor, but not all of them because not all of them have an independent source. Well, I guess that's my question. What is your position? I understand your position with respect to ones that are publicly available from independent sources. So what specifically is the problem with the ones that would be uniquely prohibited under my proposed construction? The problem is that for those that don't have an independent source, the U.S. Supreme Court has said that once the government puts a document out in the public domain, no one can be forbidden from disseminating it or talking about it. Is there anything, though? I think what Judge Graber is asking is from what I understand, there are some documents that were inadvertently disclosed but are not available on the Internet. There are some. Okay. The main document is, which I'm not going to name. So let's go for it. The authority, though, that you're relying on, I guess I want to be clear, that you think it's wrong, that the district court order is wrong or violating your First Amendment rights by not allowing to disseminate the information that's in this category of not public but in the case. Is that right? Well, it is public because they put it in the public domain. Some of it they attached to Admiral Benedict's pleading, and they filed it in the court file, and for 46 days it was public. The other documents they lodged with the clerk, 20,000 pages of documents available to the public, as in Cox, as in Florida Star. A person could go on Pacer and find part of the documents. In the sealed excerpts of record, pages 1699 to 1702, I think they are, is what was attached to Admiral Benedict's declaration. Anyone could go on Pacer and find that. There are other, in Florida Star, in Cox Broadcasting, somebody went to the clerk and said, may I see something? In Cox it was the indictments. The court said, here it is. It was a publicly available document. But it was a properly publicly available document. The problem here is that it was sort of a screw-up, right? Well, it was a screw-up in Cox. It was a screw-up in Florida Star. They did not want it by accident. They might have wanted it, but they didn't want it published, but it was properly public. I'm not sure I understand, Your Honor, that the name of a rape victim was in the indictment. Correct. It was in the indictment, properly in the indictment for the court's purposes. Well, they had a state law that said you don't put things like that in an indictment. I thought the state law was you don't publish it. You may be right about that, Your Honor. That's a difference. That's true. But there's the same sort of inadvertence there. Here the district court order only reached to the parties, right? In Cox. Yes, we're the only people in the world who can't refer to these documents. You're citing Cox, but Cox is distinguishable in that regard. In what way? The fact that the gag order from the cases you rely upon, such as Cox and Oklahoma Publishing Company, is not the same situation as here because here the district court's order only reached the parties to the litigation. I think that makes it far worse because everyone else in the world can do this but not my clients. And their whole rationale for this is a security rationale that it would be terribly But you can do it too to the degree it's publicly available, now publicly available. To the degree that for things that are on the Internet right now, that were on the Internet yesterday when I last checked, as of this moment we can't use them. Where's that in the record? Where's the court's order saying you can't do that? Let's assume for the present that you can use them. We either will interpret the order to say you can or we will tell them to write the order so you can. Let's assume you can. Now go forward with your argument. Well, Your Honor, we can't. I don't know how to assume that. Excuse me. I thought we had narrowed your argument to the question whether material that is not available on the Internet you should be able to use. Let's assume for present purposes if it's available on the Internet or in a newspaper or anything else you can use it. Now what's your argument? Okay. Now my argument is that when government inadvertently places something in the public record, as for example they did in Florida Star, the U.S. Supreme Court said this information would not be available but for the inadvertence of government. And they said, too bad. They didn't understand any of those cases to be about inadvertence. Those were properly publicly available documents. What was being forbidden was the printing of them. Your Honor, this is from page 538 of Florida Star. BJF's identity would never have come to light were it not for the erroneous if inadvertent inclusion by the Department of her full name in a report made available to the public. Okay. It's about inadvertence. And inadvertence doesn't matter. What about our main Islamic Foundation case which nobody seems to have cited which is exactly about inadvertent disclosure which we then held couldn't be relied upon? There were a number of, I believe that's a district court case and I'm not sure I remember correctly which one is which. If I remember correctly in that case, the people who were told they could not disseminate the document didn't want to disseminate the document. I hope I have that. That's the right case. But one of the cases the Navy relied upon, the document was derogatory of the- This case, as I understand it, wasn't cited by anybody but it's the case in which the government disclosed, was it the no-fly list or something like that, inadvertently and these people saw it and they tried to establish- Oh, it was the question of who was being overheard by wiretaps, right? So they tried to rely on that information to establish standing and we said they couldn't do it. Okay. I'm sorry, Your Honor. I really don't have enough of a command to that case to answer that question. The only other things I wanted to say that distinguish this case from Reinhardt is that I want to focus on the fact that Reverend Reinhardt refused to give information to the Seattle Times. The Seattle Times went to the trial court, invoked the discovery rules, asked for an order of compulsion, got it. Reverend Reinhardt was ordered forcibly to give these documents over. No one ordered the Navy to give these documents over. They did it by themselves. And it actually took the Navy only four days to violate the order which the judge entered on November 9th because four days later they again put some of the same documents in the record. Again, in supplementing the administrative record. And they can do it, but my clients can't. In Reinhardt, the order granted permission, even for the documents forcibly compelled, that the Seattle Times could use them in the litigation. But in this case, the district court's order says specifically they may not be used in the litigation. And Ms. George and I were not able to use those documents in the summary judgment, in the preliminary injunction proceedings. We could not use them. Judge Blayden's order very specifically says the only thing that we can do with those documents is show them to you for purposes of the First Amendment issue. I don't know that it matters to you that much, Your Honor, but if the court wishes to verify that you can find most of these documents, the big one, the 894-page document that I cannot name, if you wish to verify that you can find it on the Internet yourselves, I have the Internet address and I can provide it to the bailiff or the court. You want to verify that you can or cannot find it on the document? You can. I found it yesterday. And you can use it, so it's not relevant. If you say I can use it, then that... I ask you to assume that we will say you can use it. That's great. And the last thing I will say is that I would ask you, then, to say in a short order today that we can use it today, with opinion to follow, because we have been obeying the district court's order which flatly says we can't for the last three and a half years, and we would like to start using it. Okay. Thank you very much. Thank you, Your Honor. Good morning, Your Honors. David Gunter from the Department of Justice here on behalf of the Navy. Can we start with that piece? Do you agree that if something's on the Internet, I can use it? Our understanding of Judge Leighton's order is that he did not control documents that plaintiffs got from an independent source, that he was controlling only the documents that were before him within the courthouse. And even if those same documents are currently on the Internet, they can use it if they get it off the Internet? That's our understanding. And meanwhile, the Navy is also making efforts to get them off the Internet because it's hard to control all of these documents. Well, if they download the whole thing today, can they use it? I'm sorry? If they download the whole thing today and you get it off tomorrow, can they use it? Whether there might be other legal restrictions on their using it is not for me to say, but it would not violate Judge Leighton's order and is not a basis for it. As long as they get it off the Internet today? Yes. We believe that his order does not reach those documents if they get them from an independent source. Even if you later get it removed? Yes. Even if we later get it removed, again, I'm not saying what other legal restrictions there might be on their use of those documents, but it is not covered by Judge Leighton's order. Do you all talk at all? I wonder, because it's remarkable that both of you have such different views. We did have some colloquies in the district court about what were appropriate uses of these documents, and Judge Leighton actually referred to one of those emails when he said, I think that the government's counsel has set out a good understanding of this. That actually, incidentally, although it's a bit of a tangent, is why this does not fall within the vagueness cases that the plaintiffs cite because this is not like a statute where plaintiffs have no ability to go to the legislature and say what's allowed and what's not allowed here. They could go to us and they could go to the district court and say we have a specific document that we'd like to use, we got it from Google, and here's the address, and we downloaded it on this date. Is this covered by your order? And we would have said we don't believe it is, and Judge Leighton could have answered yes or no, and so there's no vagueness problem here. There's no unconstitutionality based on what this order means. Incidentally, that's what puts the order squarely within the zone of Seattle Times v. Reinhart. There the court was talking just about what can the plaintiffs do with the documents that they received through discovery in litigation. Now this was not a discovery process, but it was a mandatory disclosure process under the local rules, just like you might make a mandatory discovery disclosure under Rule 26.1, and so when Judge Leighton found out that there was an inadvertent disclosure of documents that shouldn't be disclosed, he used the tools that district courts use to try and correct that and claw back some of that information. He entered a protective order. Nothing. Go ahead. And in Seattle Times v. Reinhart, the Supreme Court upheld that use of a district court's power and said that the order has to be justified by a substantial government interest. Here there's a national security interest, and it has to be no greater than necessary to achieve that interest, and that's what I think really distinguishes judges. But what's being said is the difference here is that this was sitting on a public docket for 45 days or so. It was not simply handed over to them within the constraints of a sealed discovery process. It was only in the public docket because the particular local rule at issue here says that in these kinds of cases documents will be exchanged through the medium of putting the administrative record in the public docket. That doesn't mean, as in Florida Star, where the report was at the police station, that they're getting information at any point that was outside the supervision of the district court. And Judge Layton drew reasonable lines around what plaintiffs could and couldn't do with this information. He met the requirement of Seattle Times that this be a tailored order. The government asked for more from the court. We said we want these documents to be given back to us, but Judge Layton appropriately, at least we say on appeal, said you're not required to give those documents back to the government. The government's interest in protecting this national security information can be met if I simply say you're not allowed to use them in litigation. And so that is the extent of my order. He also said that the order only applies to the parties before him. So, for instance, Mr. Lobson does point out that this was in the public docket. It is a little peculiar when the national security interests, for example, the State Secrets Doctrine, limits litigation so as to limit disclosure because people shouldn't know this. You're sort of doing the opposite. They know it because you inadvertently gave it to them. And now we're saying, but they can't use it in the litigation, which doesn't follow very well in the sense, and I don't know if it's a First Amendment problem, but it does seem to be a due process problem or something because the interest in not allowing them to use it in the litigation is so they don't know it. And once they do know it, why can't they use it in the litigation in some sealed or non-public fashion? I think I see the problem. And the answer to the specific question, why can't they use it in the litigation, is it's not relevant to the litigation. Well, that's a different problem. I mean, that's a different answer. And I don't think their interest in using it is a First Amendment interest. But if it were relevant, it seems to me that the secrecy interests that otherwise would allow you to not have them use it have been blown. You just blew them. Well, I don't think you can separate out the fact that it's not relevant to the litigation because it's not disputed here that we appropriately designated these documents as unclassified controlled nuclear information or critical infrastructure security information. It's assumed, for purposes of this appeal... And you're saying it's not relevant because NEPA incorporates the FOIA exceptions and it's within the FOIA exceptions and therefore it's not relevant. That's right. So under Weinberger v. Catholic Action, they cannot use it in their... Well, it's not about Weinberger. See, that's what I'm saying. It seems to me it's not about some common law state secrets privilege. It can't be because it's been disclosed. I see. So you're right that Weinberger was more about information that simply could not be disclosed in more of a state secret doctrine, which we're not relying on anything like state secrets here, but then look at San Luis Obispo Mothers for Peace where the court said the Navy can comply with NEPA with its obligation to consider all of the necessary information that it has to consider without necessarily doing the full disclosure that NEPA would ordinarily require because a FOIA exception applies. Right. So it's basically a relevance question because of the way the statutes operate, but not... Okay. Do you want... All right. You don't have to stay on this issue. You can go to the rest of the issues. Let me ask you about the Explosive Safety Board. It appears to have had relevant expertise. So why wasn't the Navy required to publicly consult with the board before approving the final EIS? I think there are two answers to that question. One is that the Department of Defense Explosive Safety Board is part of the Department of Defense. I'm not sure, at least from other cases, I've never understood that to matter. It may not matter in a case where the consulting agency has a particular expertise that is unique to that agency. So, for example, Department of the Interior has to consult with its own agency, the Fish and Wildlife Service, on issues that... Well, this seems to be exactly that. It seems to be an agency that is specifically directed at explosive risks. I disagree. Well, I mean, the Department of Defense Explosive Safety Board does have a mandate to minimize explosive risks, but it's not the only agency within DOD that has that responsibility. That's not what the statute says. It says it's supposed to consult with agencies that have a special expertise, not the only agencies. Okay, so that brings me to the second answer then, which is that the Department of Defense Explosive Safety Board has a particular mandate that may not be relevant to NEPA, which is maximum possible protection. And this court discussed that distinction in Ground Zero One. But it still has... There's the recent Idaho sheep case, which has some discussion of this, of the consulting issue, although it ultimately concludes that the failure to discuss was harmless. But in that instance, the argument was that this research group was basically focused on domestic sheep, and the issue was about wild sheep, bighorn sheep. So therefore, they weren't... And it seemed to me there, and it seems to me here, that certainly they have a relevant expertise. They know about explosive risks. So it may be that the standard they apply is different, but they know about explosive risks. I think it's important to remember, though, that the Explosive Safety Board never said that this was an unsafe activity. They never found that it was unduly risky, and they accepted... I don't think it would have been pertinent to the public perception of this project and to the comments that would have been gotten and to the degree to which this would have been investigated that, as I understand what the Safety Board was saying, was that the conclusion that this was an infinitesimal risk hadn't been sufficiently proved up. So let me try and clear up confusion on that. The DDESB didn't contest our conclusion that the risk of an explosion of one missile as a result of an accident is less than 1 times 10 to the minus 6, less than 1 in a million. What they were interested in is the probability that if that explosion occurred, which is already less than a 1 in a million chance, would it propagate to the other explosives handling war. So if we look at Ground Zero One, we know this is the kind of improbability compounded with improbability that Judge Gould in that case said was an infinitesimal risk that doesn't even need to be studied for NEPA purposes. And he contrasted that risk with the Explosives Board's own mandate of maximum possible protection, which the Court can read about in the record for this case, too. But even if the risk was negligible, why wasn't the Navy obligated to disclose that the Board had denied the plan it was seeking to implement? The Board actually gave preliminary approval for a plan and asked for additional study so that it could understand the exact risk, not of an explosion, but of a propagating explosion. Let's take another related example. What about the representation that you complied with all regulations? That particular representation that we would not conflict with federal requirements then provides a list right after that in the EIS of the particular regulations it's referring to, like the Clean Air Act and the ESA and things like that. Explosive safety requirements were not on that list. That's not what that statement was referring to. It's a ball-hiding exercise, wasn't it? I don't think that the Navy was hiding the ball here. I think the ball was just so, so tiny that the Navy was not required to point it out. Pretty big. You had to go get an exception from a... essentially go over the head of this Board and get an exception approved? That's right. But that is fully consistent with what this Court said about the Navy's NEPA obligations in Ground Zero One. In that case, the plaintiffs pointed out the Navy has internal requirements that require it to look at maximum possible protection on these issues. But that is different from the NEPA requirement of reasonably foreseeable risk and significant risk. And that is not something that the Navy is obligated to discuss under NEPA. Again, we found, based on a quantitative analysis, that there was less than a one in one million chance of an explosion, and even less than that of an explosion that propagates to the other facility. Again, it appears that it's precisely that analysis that was at the center of the Board's at least concern that more had to be done. Again, our submission is that the risk of an accidental explosion of one missile is below the threshold required for NEPA analysis. And then the DDSB was concerned about the risk of propagation, which is even more unlikely because it is a possibility compounded against that already one in a million probability. But I would also point out for NEPA purposes that this court has said NEPA does not require the agency to go out and conduct new studies. It's allowed to use the best available information that it has. And ultimately, the court has to apply a rule of reason. So what the plaintiffs are asking for, and Ms. George asked for it again today in her request for release. But where have we said that? I'm sorry. I did not understand that to be the general rule. The case that I'm thinking of is the Snow Basin case, League of Wilderness Defenders. Which one, I'm sorry? It's League of Wilderness Defenders. It's cited in our brief. And the easiest Westlaw search for it will be under Snow Basin, which was the name of the project. And there, the agency used about studies from the early 1990s, as here, to conclude that there were none of a particular kind of protected fish in a stream. And the plaintiffs said, no, you have to go out and do an additional study today. And the court said that's not what NEPA requires. You can use the agency. I thought it's not what it requires if there's a basis for extrapolating from then to now. But otherwise, you may have to at least either collect the information or say why you can't. And our view is that there is a basis for extrapolating from then to now. But you made a much more definitive statement, that you don't have to do any research, you just have to look at what's out there already. Sorry, you're right. If we can reasonably draw a conclusion from the data that currently exists, then we're allowed to do that. And so here, the Navy would have had to conduct a study that cost millions of dollars and would have delayed the construction of an essential facility in order to determine whether the risk of an unacceptable accident, in particular the risk that the Explosives Board was asking about, was less than one in one million or much, much, much less than one in one million. When you're talking about the rule of reason under NEPA, it's not reasonable to require the agency to make an in-depth analysis of every tiny possibility like that. The Navy is only required... This is maybe a small risk of a very big problem. It is. An extraordinary big problem. Right, and the court in Ground Zero One answered that point too. Again, that case was about explosives handling at Naval Base Kitsap, and it said that when you're talking about catastrophic consequences, you have to analyze them if the probability is unknown under the regulations. Here, the Navy did a quantitative analysis to try and pin down exactly what the probability was. Well, I thought it didn't. Just use the old one. No, I'm sorry. It conducted a new analysis, which is in the record, and the court can see that mostly in the supplemental excerpts of record. We have new memos at Supplemental Excerpts 99 at 102. You can see our method at Supplemental Excerpts 43. You can see the results at Supplemental Excerpts 57. And the plaintiffs don't contest any of those calculations. They just say that there should have been more disclosure of those calculations in the EIS, and our submission is that the disclosure was sufficient given the very, very small risk of the event that they are concerned about. I think I've covered... I just want to clarify one thing. This is an unusual situation in which there's a... I guess because of differences in what should have been made publicly available, much more in the administrative record, publicly available administrative record, than the public could see at the time of the EIS. So I gather that your arguments about this are essentially harmless error. I mean, I gather you're not contesting that this material should have been available at the time of the EIS. Actually, I am contesting that. Why? So there are two separate questions that I would address. One is that the entire administrative record doesn't have to be available at the time of the draft EIS so that it can be commented on for the final EIS. The administrative record is something that's put together after the decision is already made so that judges can review the agency decision. What's required at the time of the draft EIS is information that's sufficient for the plaintiffs to make intelligent comments about the issue. But here, for example, you included in the EIS Appendix A, B, and C, but you said they couldn't be revealed. And in fact, now you say they can be revealed. Right, so that's the other point that I would like to make. The question for NEPA purposes is, did the agency have a good faith basis for making those designations at the time that it made them? Why is that the question? Because... Well, think about the context of an administrative record like this. We're talking about hundreds of thousands of pages. It might be reviewed by several different individuals. Some of the discrepancies here were revealed by Mr. Milner's other... There's a statutory requirement, as I understand it, that the EIS be made public and available for comment unless it comes within the FOIA exceptions, and it either does or doesn't. So why is there a good faith exception? No, we believe that it was within one of the FOIA exceptions. The Navy later on changed its position on that and concluded that it did not have to withhold... Then why isn't that a legal standard? It either does or doesn't. The legal standard under 10 U.S.C. 128 is if the material could reasonably be expected to have an adverse impact on the common defense and security by significantly increasing the likelihood of sabotage of special nuclear materials. Does FOIA have a good faith exception? I don't know the answer to that. I don't think so. It either does or doesn't. It either is or isn't in that category. But I understood, at least, or at least if I were you, I would take the position that it's a harmiceric question. Right. Our first position is that we had a valid basis for designating this as nondisclosable at the time. Our second position is that it is harmliceric because the EIS has a qualitative discussion of these issues. It talks about, for example, the 400 operational days requirement. It talks about that there are explosives arcs, even though Appendix C was not public. And actually, now the redacted version of Appendix C has been released that does not reveal what those explosives arcs are. And so the question underneath it is, is this adequate for the public to have input on these issues? And I think that we see from Mr. Milner's comments that he clearly was able to comment on these things. For example, he proposed explosive safety arcs that the Navy should be using instead of the ones that he thought the Navy was using. Does your argument about the fact, the Ground Zero One argument, that is, we didn't have to discuss this risk because it was so infinitesimal, come into this? Or does the fact, I would think not, because to the degree you did discuss it, I would think that you have that the underlying and attached appendices, which you then redacted, suggest that at least to the degree you discussed it, the material, if it had to be available, had to be available, you can back out and say we never had to do it at all? Or can you do that? I'm sorry, Judge, I'm not understanding your question. Are you also arguing that all of this never had to be discussed at all because of Ground Zero One and the fact that the risk was so tiny? Yes, I think that the Navy could have written an EIS that did not discuss this, but it wanted to reassure the public of, in particular, one of the largest arcs, the inhabited building distance, which relates to homes and businesses that are not related to operational requirements. This was the only location where it could put this wharf where that distance would be entirely within the bounds of the naval base. And so I think it wanted to reassure the public that that would be the case. But yes, I think that under Ground Zero One the Navy clearly could have simply not discussed this issue at all because the risk is so, so small. But once you do discuss it, doesn't that still bring in the FOIA exception, i.e. if you're going to say something you can't withhold the information unless you have a basis for withholding it? I think that, well, first we submit that we did have a basis for withholding it. I understand that. Right. But second, we need to disclose as much information as necessary for the public to have meaningful input. We don't have to disclose everything in the administrative record because obviously the Navy is having a lot of internal discussions. It may be having different people within the agency look at these issues, and that's not all information that gets put into the draft EIS for public comment. The question is, could the public have engaged in participation on this issue? And I think that the record shows that it could. Okay, your time is up. Unless there's something you're really dying to say. I'm sorry? Unless there's something you really feel you must say. In my last 10 seconds, I'll just make one point which I haven't heard yet, which is that this is an essential project to national security, and the Navy had limited options for it. So what the Navy did was make a full analysis and disclose as much as it responsibly could disclose, and that's all that needed to be required. But it didn't. I mean, that's the problem. In fact, it didn't. That's really the problem here because you later concluded that you could disclose more than you actually disclosed. Yes, we later concluded that because different reviewers looking at the information made a different judgment call based on the statutory standards. I don't know any other case like this. It's sort of sui generis in that regard. It is, but recall that all of that is coming up after the administrative record is already closed. The question is, at the time the EIS was complete, had the Navy disclosed enough to meet its NEPA obligations, regardless of what it may later have concluded about those documents? I think it's admirable that you disclosed it now, but at the same time, it makes an interesting question. Well, that's an interesting point about this case because the Navy was just trying to get this right. It has made some mistakes with these documents, and it was trying to get this right. And Judge Leighton, too, when he entered his protective order, he was trying to get this right. He says, Congress has protected this information from disclosure, and what can I do using my tools to control the documents? What I'd like to know is what happened to the person who sent in the record with the information? It's happened before. I mean, when I was in practice, it's happened. Right, and I can't speak to that, but once it has happened, what are the district court's powers and what are the Navy's obligations? So we have tried to get this right and protect the information that Congress had said must be protected, and it's the plaintiffs who are trying to exploit this information and let the horse out of the barn as often as they possibly can. Okay, thank you very much. Thank you. If I may speak for one minute and then hand the mic to Mr. Lobson's for a minute. You may just have a minute. You should both whenever you're time. Go ahead. Okay, thank you. Well, what we're hearing now is post hoc rationalization of counsel, and this court has said that does not suffice, that that cannot cure violations of NEPA, which occurred during the public process. There's no harmless error when you lie to the public throughout the process when the public is supposed to be informed so that it has a meaningful opportunity to influence the project. That didn't happen in this case. Now we're hearing from counsel, oh, we did conduct a new analysis. Well, that wasn't in the EIS. There was no reference whatsoever to any scientific basis for this statement that this project causes no increased danger. No scientific basis at all was given to the public. League of Wilderness Defenders does not say what counsel represented. What it does say, in fact, is that an EIS must explicitly refer to the scientific or other sources relied upon for conclusions in the EIS. That didn't happen here. There's not one reference to any study, either old or new. And just very quickly, I wanted to read to you the Navy's own words regarding this issue of whether it did a study or not. There is no clear data to answer the DDESB inquiry. As such, the Navy cannot satisfy the DDESB's request to provide data demonstrating nonpropagation. In order to satisfy this question, an analysis would need to evaluate a scenario in which a missile detonated during loading on the hook over the missile hull and determine what degree of propagation is likely to other missiles on board that SSBN as that would be used to determine what level of propagation or damage might occur to a missile being loaded and missiles in the SSBN hull at the other EHW. So these are the Navy's own words. They're saying, we don't have the data. That's what their record showed. And this letter was two months before the EIS was published. Thank you. Dr. Murgia, you expressed some wonder that we didn't consult with each other, the parties, and I just wanted to address that for a moment and tell you exactly what happened on the independent source issue. On November 9th, at the hearing where the order was entered, I raised the independent source question and I asked Judge Layton specifically, may I tell Mr. Milner that if he goes home... And he said, I'll tell you later. He said, I'll tell you later. All right, we know that. And the government, he said, I'll tell you after I ask the government. The government did not say, of course they can. We then moved. They said nothing. He said nothing. We moved for reconsideration and clarification. The government did not say, of course they can. The government said nothing. Okay, but sometimes you ought to read what the panel is saying and what's being said. Panel fine. That's not your problem. Panel fine. I think it would be terribly irresponsible of me to turn to Mr. Milner and say, go ahead and violate the judge's order because the Navy says it's okay. Also, Judge Berzin, you said that you thought that the can't use it was maybe a due process problem but not a First Amendment problem. And we took the position below. We took the position here that it is a First Amendment problem because that includes the right to petition the government for redress of grievances. And if we can't use this... I understand that. There are a lot of restrictions during litigation on the use of material. So thank you very much. Thank you both. The case of Ground Zero Center v. United States Department of the Navy is submitted, and we are adjourned.
judges: Graber, Berzon, Murguia